The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Please be seated. We will hear now our last case, number 224499, United States v. Whitehead. Counsel, when you're ready. Thank you, Your Honor. May it please the Court, I'm Rudy Ashton. I represent David Whitehead on this appeal. And I understand the primary issue here is what constitutes bringing a person in at a place other than a designated point of entry. Mr. Whitehead, we contend the Rule 29 motion should have been allowed. There was insufficient evidence that he actually conspired to or brought anybody into the United States at a place other than a designated point of entry. And there was insufficient evidence that came in regarding what is or what is not a point of entry. I give you a hypo that I think illustrates what I think is the ultimate question about this. Right. So let's just assume at places around the Rio Grande River, there is a bridge. And at the other end of the bridge is something labeled port of entry to the United States. Right. And obviously walking across that bridge and walking up to that door is entering the United States. And we all agree that's entering the United States at a designated port of entry. But now imagine, which isn't that far-fetched, that I swim across or I go across that bridge on a raft. And then I get to the other side of the river, cross the river, sorry, river. I go across the river. I land basically at the same place that the bridge also connects to the land. I walk up on the land. I walk up to that door and I knock. Have I entered the United States at a port of entry or not? I would contend that, yes, you have. And why? Because any act of crossing the river is entering at a port of entry? Or is it because as soon as I got to the other side of the river, I walked to the building makes it a port of entry? Or because I always intended to do that irrespective of what I actually, you know what I'm saying? Because clearly there's ways to swim across the river that are not entering the United States at a designated port of entry. You'd agree with that, right? Right. So what makes some acts of swimming across the river entering at a designated port of entry? It's what I intended to do when I got to the other side? I don't know if it's what you intended to do. It can be and certainly it can be what in fact happened. And that's what- Well, I guess another way to think about it is imagine that I touch ground and the border patrol apprehends me instantaneously the moment I get out of the river. Have I entered the United States at a designated port of entry or not? I would contend yes, you have if they take you to immigration, which is what happened here. And the facts in this case- Whether I've entered at a port of entry depends on what the border patrol does after they apprehend me? Well, if it's not the exact port of entry, but if it's closely by. And what the evidence in this case that they've shown is actually when they asked the Ordonez lady when she came in if she entered at a port of entry, she said yes. But then she also said no. The prosecutor then went around and asked other questions if she came in in a boat. And then she walked up the road until she saw a border patrol at a bridge, and they took her back to immigration. Presumably like her legal analysis on whether that was entering at a port of entry is not controlling on us, right? I mean, in good faith, if she believed that that was a port of entry, right, the river bank was a port of entry, that doesn't make a difference to us, right? So the question is, what did she do as a factual matter? She came across on a boat, not swimming, but otherwise like approximating Judge Hyten's hypothetical. But I'm having a hard time understanding how you come across on the boat, you get out on land, and then in that land presumably you agree is the United States. Oh, yes. And then you walk to a port of entry. Is there a time limit? What about if I do it a week later? Would that still be like entering at a port of entry? More than likely not, but I certainly think in this particular case, they called two witnesses, Ms. Ordonez, who was involved in my client's case, and then Ms. Menjivar, who had come in earlier. And then Martha Zelena, when she testified, she said this was the process. They would bring them over, and they were to walk until they saw a border patrol and went into immigration. So it does seem clear from the evidence that the intent was that people would turn themselves in when they got to the United States, but is it your position that turning yourself in to border control means entered at a designated port of entry? Well, there's some vagueness there, and what I tried to do was find a definition of it. And I tried to find a definition. I could not find one in the statute's guidelines or anywhere else. What about the jury instructions? Do we instruct the jury on what they had to find on this basis? Basically follow the elements. Bringing someone in, not reporting to a designated port of entry is an element, and it has to be proven, and in the statute and the jury instructions. The statute doesn't say not reporting to a designated port of entry. It says entering the United States at a location other than a designated. That seems like that distinction might matter. Right. We all agree they reported to a port of entry, right? That fact was true. The question is, is that where they arrived, or did they go there after arrival? They didn't go there immediately, but it was fairly close. In Ms. Odenis' case, she walked somewhere and went to a bridge. They took her in there. She reported. They told her to come back in two days. She reported again. Then they let her go. Do we know which bridge? I think there are two bridges that are sort of right here. Do we know which bridge she went to? The agent testified the port of entry there was Hidalgo, which is near Reynosa, Mexico. It's in the Brownsville District. Yeah, the challenge is there are two bridges that are, like, arguably in Hidalgo, one of which has the name Hidalgo in it and one of them doesn't, but the one with the name Hidalgo in it doesn't actually appear to be in Hidalgo. That's why I was trying to figure out which of the two bridges that are there. We don't know which bridge? I do not know which bridge, except the agent testified she was taken to Hidalgo on May 31st of 2019, and she apparently reported there. She came back in two days, then went to Dallas, and then went to Boston. The position we have is they have to prove my client knew all this. He just went to Boston to bring her back when Mr. Peterson left his wife up there, and then he ended up actually bringing her back, leaving her at a Cumberland County Sheriff's Department. After talking to his wife on the phone, and Mr. Peterson arrived very shortly thereafter to pick her up. But I submit he was trying to stay uninvolved, but he was certainly, you know, helping out. They got stranded up there. So my understanding, and I haven't read the whole trial transcript, but from reading chunks of it, it seems like that was basically the defense at trial, right? Like my guy was not really involved with this conspiracy and didn't know what was going on until it was too late. So it doesn't seem like this port of entry question played any role at trial, and the jury was instructed on it as an element, but nobody asked for instruction. Your client did not ask for a jury instruction on a place other than a designated port of entry, right? Was there any clarifying instructions or anything like that? There was no clarifying instruction, but the judge did instruct that the government had to prove that she, he knew she entered at, did not enter at a designated port of entry. But there was no sort of targeted Rule 29 motion that says, I move for a judgment acquittal on the grounds the government completely failed to prove the point of entry point. It was more of a, there's no evidence that he knew, there's no evidence that he participated, but not a, like, because you can imagine the opposite, right? The opposite would be, oh, no, I agree, they have lots of evidence that I was way involved and lots of evidence that I absolutely knew, but because of what, you know, people might pejoratively call a debater's trick, you still have to grant my Rule 29 motion because the government never proved this specific thing. There wasn't any sort of argument to that effect. Or both. Or both, or both, right. You got no evidence I knew and it didn't happen. Well, what happened here, the lawyer did file a Rule 29 motion. He went off on the labor accounts to start and they were dismissed. He didn't get into the others, but then Judge Boyle, the district court judge, intervened and he was very proactive in this and he actually made the comment to the U.S. Attorney, they weren't smuggled, they just came in and surrendered. What do we do with that? And then the lawyer just prompts the judge, that's what I was going to argue next, that this is not a smuggling case. This was all during the Rule 29 colloquy. But there wasn't anything sort of equivalent, I'm forgetting the name, but the case where Judge Urbanski dismissed an indictment because the indictment never said the words other than a designated port of entry, right? Yeah, there was. There's nothing like that. Right, there was a case like that and it is a necessary element. And that case was dismissed. Now, we're not complaining the indictment was defective. It had the knowingly, it had all the elements in there, but what we're saying here is they didn't prove that Mr. Whitehead knew where she came in. They certainly didn't prove he knew she did not come in a designated port of entry. So I did read that colloquy with Judge Boyle at the Rule 29 hearing and it seemed like Judge Boyle was making almost, you might think of as more of a mens rea point, that, look, it's not smuggling, prohibited by statute, if you're not trying to evade immigration officials. You have to be trying to sneak around immigration officials for it to count. That seems slightly different than an argument that, look, whatever your intentions, you came in at some place other than a designated port of entry and it sort of doesn't matter at that point whether you then promptly reported to an immigration official or not. What matters is where you came in. And I guess I'm asking you, if you were making either of those arguments, which one is it? Is it that under this statute you need an intent to evade immigration officials or is it that under this statute, this statute would apply even if you don't have that intent so long as, I can't even say it right, is it that you need an intent to avoid immigration officials or is it sufficient that even if you intended to turn yourself in, you set foot in this country at a place other than a designated port of entry? Well, when I tried to look all this up, that's sort of the question I had. There were two problems. And the statute itself, the designated port of entry, it sounds like an easy thing to say, but it's really not. There is some vagueness to it. And I think in this particular case, the way the evidence developed, the fact the process that was developed and what occurred was that these ladies that my client's wife was bringing in actually went across and they were to seek out a border patrol who then took them to immigration. Maybe if I ask the question this way. From the evidence at trial, from the kind of conflicting testimony from this witness, it seems to me a reasonable juror could come to the conclusion that this woman entered the United States, set foot on United States land at a place other than a designated port of entry. Close to a designated port of entry, maybe intended to get to a designated port of entry, but that's not where this person first set foot on United States land. A reasonable jury could find that. Defendant didn't ask for instruction saying that, no, no, a reasonable jury has to find more than that. So based on the instruction a jury was given, a reasonable juror could find that. Is that sufficient to meet the government's case? The judge's instruction, the jury's instruction followed the statute. I understand. The judge said it has to be a place other than a designated port of entry. So I'm saying a reasonable juror could hear that and then find from the evidence this woman, and I'm sorry, I don't remember her name, first set foot on land at a place other than a designated port of entry and therefore vote to convict. Is that fine? I don't think it's fine, but I think that's probably what happened. So you think, in what sense is that not fine? Where is the problem there? If there was sufficient evidence for a juror to find that this woman set foot on land at a place other than a designated port of entry and the defendant didn't ask for an instruction elaborating on this element, why is that not okay? There is sufficient evidence. I think the question on where they come in and what's a designated port of entry, that's fairly clear. But what is involved, especially in this case where they actually reported to a border patrol, were taking the immigration shortly thereafter. I think one lady was 45 minutes, and I think Ms. Saldonis, we don't know the time. But more importantly, the question is, from my client's standpoint, is did they prove that he knew it or even had reason to know that she did not come in at a designated port of entry, especially under these circumstances? And with Ms. Saldonis, at the time he went up there, it's been one or two months. All he did was drive her back from Boston, and that's in that particular case. And then the e-mails, I think there were something like 59 e-mails that they had, and only three of them they attributed to this. Again, I think the e-mails were going to families and friends. It's a fairly routine thing that my client did. And again, the same element is in the money laundering counts, that he had to have knowledge that she had come in not at a designated port of entry. Seeing I've run over, I'd like to reserve the last few minutes for my rebuttal. Thank you. Thank you. Thank you. May it please the Court, Julie Childress, Assistant United States Attorney for the Eastern District of North Carolina, representing the United States. The defendant failed to raise the issue of what constitutes bringing to or entering the United States at a place other than a designated port of entry. Therefore, the issue has not been properly preserved on appeal. However, if this Court does decide it has been properly preserved. Where do you think the defendant failed to raise it? In the district court, in the briefs before us? Where is the forfeiture? Both. But particularly argument-wise, it would be in the initial brief. A party waives an argument by failing to present it in its opening brief or by failing to develop its argument even if its brief takes a passing shot at the issue. The initial brief did not specifically point out to coming into at a place other than a designated port of entry. The elements argued in the initial brief were together. They were never separated. In addition, in front of the district court, there was a significant argument brought up during that Rule 29 where the argument was about the forced labor and restraint. The actual assistant United States attorney brought up the issue of coming into a place other than a designated port of entry, and defense counsel was still silent on that issue. If this Court does decide that it was properly preserved, we would argue there was sufficient evidence that K&O and DEH, her child, came in at a place other than a designated port. Well, can I just ask the sort of same question I asked your colleague? What is the United States' view about what it means to enter the United States at a place other than a designated port of entry? In the government's view, what is the definition of doing that? So first and foremost, let me tell you the definition that I found for port of entry. So per the Code of Federal Regulations, a port of entry means a port or place designated by the commissioner at which a person may apply for admission into the United States. These ports of entry, this is under CBP, these ports of entry where a person or people can lawfully enter the United States, international airports are usually ports of entry, places at a land border, and then major seaports. So the evidence presented at trial, particularly as to, we call them the two Karens, but that would be KYM and K&O both, is that they were going to go across the Rio Grande, one of them in an inflatable raft by testimony, the other in a dinghy. They were instructed by smugglers to then get across to the border, and then testimony came in. Wait to get caught. What I'd like an answer to is what does the government think is the answer to the hypo I started with, which is so there's a bridge, and at the other side of the bridge there's a building, and then a person, they don't walk across the bridge, they swim under the bridge, and then they hit land, and immediately upon hitting land they walk up to the building. Has that person entered a designated port of entry or not? We would argue no. Okay. I would argue that a port of entry is a place where you submit yourself prior to coming into the United States to immigration officials. But hold on, in my hypo there's no way to do that because presumably the border, I'm guessing, but, like, imagine the border is in the middle of the river, and, like, there's not a building in the middle of the bridge. Like, there is no place to literally submit myself at the border because the border is in the center of the bridge, and there is no building in the center of the bridge. That is correct. As a follow-up, we would argue that at that point you are trying to go around and not go through a port of entry, and you're trying to basically make yourself. So I guess in that hypo, and the bridge, and there's a building, where is the port of entry? Is the port of entry the international border, or is the port of entry the building? The building. So when I swim under the bridge and walk up to the building, I've literally gone to the first place I could go to, right? That is correct. So why isn't that a port of entry? Why would it be? I don't understand why you make that argument, right? Like, when we think about an airport, right, we don't think about it as being the building, right? It's the structure, right? So when you've got a bridge, right, the port of entry is the bridge and the building, but it's also like the lane, right? So lots of times you don't ever go to a building, right? You pull up at the lane. You know, if you ever cross the Mexican border, you don't actually go in a building. They don't get you out of your car, right? You pull up to the lane. There's no building. You're still in your car on the bridge. But we would consider that part of the point of entry, right, the port of entry, right, even though there's no building there, right? I'm just being checked at the side of the road. So it's not that it's a building. It's not that it's a person. It's this structure, right, which includes the bridge that leads you to no place other than the line of, you know, vehicles that you go through. And there's probably a building, too, so that if you walk, maybe you walk into that. But I don't know why you would narrowly define it as the building. And I misspoke. I'm not even sure there is a building. To be totally fair, I mean, I assume there's a building. It's not necessarily the building because when you are getting off of an international flight, per se, you're in queue. You are in a queue. You are not yet into that international country. The jetway. When I'm on the jetway, that's part of the port of entry, right, because they're keeping me in this line. That's why they close the certain doors and whatever, right? That's part of the port of entry, no different than the bridge is part of the port of entry, even though the officer doesn't show up until I get to the end of the line, right? I've snaked through the whole system, and I get to the end of the line. But we don't think of the jetway as not being part of the port of entry. That is correct because there are pedestrian bridges. But I think so, like, okay, hang on. So, like, if I'm in the only point of reference I have is customs at an airport, so I'm in line for customs. You're saying I'm at a port of entry. If instead of waiting on line politely like I'm supposed to, I kind of circle around, and then I come up to the side of the guy who's checking the bags and say, do me first, like, have I not submitted myself at a port of entry because I didn't stand in line? No, I think that you would have to already be in the country, and I think to the point of swimming under the bridge and then making it to land, and I think the whole point of port of entry is to submit yourself to immigration officials. If you don't wait in line, that's the government's argument. Prior to getting. If you wait in the line, that satisfies this element, and if you don't wait in line, even if you end up at the same place where the people in line are, you go to, you know, if you just cut the line, you swim under the bridge, you walk around the line, like, aren't you still at a port of entry? Well, I think that you are already in the country, and I think that's probably. But help me understand the difference in two hypotheticals. So Judge Harris gives you one hypothetical, I cut the line. The other hypothetical is instead of going to immigration, I go out the side door of the jetway, right, and walk down on the tarmac and meander myself across the tarmac and then come back on the backside of customs. In that scenario, we would say you haven't submitted yourself at the port of entry, right? I mean, because now you have left the port of entry. You've avoided customs. Well, you've jumped off the bridge, effectively, right? So now you are no longer, you've now gone on the tarmac. That's not part of the port of entry, right? That you've now left the port of entry, which is the bridge, the jetway, right, the area that is the line, not literally the line itself, but the area that is the line. Well, we would argue that the port of entry also includes the immigration officials that will then either let you enter the country or say, no, you are not allowed to enter the country. But it's not limited to that. Like the bridge is the port of entry, so what if you get dropped off on the bridge? So now, good, you're at the port of entry, and then you jump into the water and land somewhere else. The bridge is the port of entry? Is it sufficient? You're saying it's necessary but not sufficient that you be on the bridge? I think the port of entry would be what we call perhaps the structures that have been designated to say everyone needs to go. Like a metaphysical thing. Like when you say structure, you don't mean literal structure. You mean apparatus? That is correct. Metaphysical apparatus. That is correct. And I believe the evidence that was presented during trial is that that was the whole scheme. The whole scheme was that we know what happens if you are a woman and a child. If it's the metaphysical apparatus, why isn't it enough that you give yourself up to border authorities knowing that they will bring you to that place, the designated port of authority, where you may seek admission lawfully? If you know that's what's going to happen, why isn't that the apparatus? Because you've already made it to land in the United States without going through the proper immigration channels because the purpose of a port of entry is not only to make – I think that the statute basically reads bring an alien to the United States and not go through the proper immigration authorities. And that is a perfectly legitimate reading. That's how we should read it? I'm not at liberty and in a position to tell. Please tell us what you think the statute means. Okay. So as far as in regards to this case and what was – What does the statute mean? What does the language mean? I think you're at liberty to tell us that, right? Well, I believe what it means is that you are coming in – So a port of entry is a designated place, and that would include with signage and where immigration officials are, where you, if you would like to come into the country, you submit yourself to those officials with documents to then ask or to see if they will then allow you to come into the country. And in these cases, what was presented at trial and the evidence was that that never happened. They came across in a dinghy. They came across in inflatable rafts, and that there was a scheme knowing that if we can just get you into the United States and then you walk – Can you go back to Judge Harris' question, which I thought was actually sort of more I've thought about as hard? So what about the one where you jump off the bridge? So I get that maybe this case isn't that hard, but help me think through, like, what do we do about the jumping off the bridge example or, like, escaping through the airport? Like, you land, you're coming through, but you – and then never present yourself to the officers. I mean, it seems like on the language itself that might actually not qualify, that if I walk across the bridge, but right before I get to the end, I jump off the bridge. So now I've come in. I've now evaded, right? So I may have done some things that are illegal. But as far as this statute goes, maybe I haven't violated it if I jump off the bridge. Well, I would ask, where did you jump off the bridge? Did you jump off after? Yeah, on the U.S. side, right? So I get across the border. Back to Judge Hyten's question, I get across the border, right? So I'm technically on the U.S. side of the bridge, and I jump off the bridge or climb down the bridge. I don't know how high they are, but whatever it is. Maybe that actually seems like a hard question. It is a hard question. I would also, the whole purpose of the port of entry, again, I come back to submitting yourself to come into the country, and if you're jumping off the bridge before you've done that. So that's totally right for the purpose, right? But we don't just, like, figure out what the purpose is and then read the statute to fit it, right? I guess another example, I fly into Dulles Airport, and, you know, customs there is horrible, and you have to go through all these doors, and most of them are locked, and they put you down this funnel. But let's just say, like, someone just screwed up, and one of the doors out of the customs area is just open, and I just walked through it, and now I'm in the main terminal at Dulles. And I didn't break anything. Someone just left a door open they shouldn't have left open. Have I entered the United States, I mean, at a place other than a designated port of entry, then? Possibly. Because I walked through a door that no one told me I couldn't walk through? Yeah, why? You are in line like you're in customs. You're in the metaphysical apparatus. Well, it seems, specifically pointing back to this case, is that the scheme was, okay, we are going to pay smugglers to get you into the United States, and then at that point you will walk 45 minutes, you will walk, you will wait until you are caught, you will wait until you are apprehended by border control. The statement testified was not that. It was that she came over. I mean, it's a little unclear. It is vague testimony, but burden on the government. So she comes over in a dinghy, and then it sounds like she lands very close to this port of entry and then walks herself right to, effectively, the front of the line. She skips the bridge line. She cuts in at the front of the bridge and reports. What's wrong with that? Well, I think you're reporting after the port of entry. So the point is to go to the port of entry, submit yourself to the port of entry to see if the... Okay, let's call it my hypothetical, which I think is consistent with her testimony. And it's really, I guess Judge Heitens' hypothetical from the very beginning. She skips the line by rowing across the river, and then she goes immediately. It probably takes her some number of steps, but she goes immediately then to the head of the line and reports, submits herself to immigration officials at the end of, I don't want to call it, at a port of entry, because that's sort of assuming the answer, but at the head of the line where all those people are waiting on the bridge, she cuts to the front of the line, having come over by boat, and submits. Is that presenting at a designated port of entry, or is it necessary that you wait in line on the bridge? I would argue in your hypothetical that she didn't skip to the front of the line, that she skipped the line altogether and went ahead and came into the United States, and that you have to go through the port of entry, submit yourself, present documents to then, at that point, will the United States and the immigration officials— Did she present her documents and everything? After she had already come in, not before. But so does everybody who waited in line, because they crossed the border on the bridge. They also were presenting their documents after they come in. They are supposed to be stopping and then be allowed to either end, because you can— Are you saying there is an inspection right at the border on the bridge, so in the middle of the bridge there's a line? They are supposed to be—their documents are supposed to be inspected. I mean, there's pedestrian bridges in California where you can get a day pass into the United States. I guess I'm asking, assuming that the border is sort of— the border is at the halfway point of the bridge. This is information I didn't have. You're saying that at the halfway point of the bridge is where they're inspecting documents. They don't wait until you get over the bridge? They are going to go wherever those immigration officials are. I'm sorry, the they in my sentence is the immigration officials. Are the immigration officials checking documents in the middle of the bridge or only at the end of the bridge? My understanding is that they are checking documents prior to anyone coming into the United States. Prior to anyone setting foot on land in the United States or prior to crossing the borderline on the bridge? I do not know the answer to your question in regards to that specifically. I'm not aware, but I will say I do not have record information on this. But I was not aware that they checked them in the middle of the bridge, but maybe they do. I do have information that there are pedestrian bridges. You go and you would submit your documents to immigration officials prior to coming in, and then at that point they can give you a day pass to enter the United States, at which point at the end of that 24 hours you're allowed to—you have to go back. Maybe this probably just shows my ignorance of the system. If this Karen—you call her Karen, whatever her initials are, the woman we're talking about— if she had walked across the bridge and gone through the process, based on the documents she had, would she have been allowed in the country? What would have happened? Based on the information that was presented at trial, she did not have proper documents. And based on her testimony— Literally, just like physically, what happens at that point? She walks up, and assume I accept hypothetically that— She waits in the line. She waits in the line. She gets to the front of the line, and she says, here are my documents, which are not useful to getting into the country. What then happens? Is she turned around and sent back across the bridge? Is she allowed in and reports back later? Like, I confess, I'm just not sure in the situation we've got with her, and she gets—if she followed the bridge all the way there, wherever it is, and talks to the person, what physically happens when she lacks the proper documentation? My understanding is that it depends. It depends because there are extenuating circumstances that she could perhaps ask for asylum at that point prior to coming in. She could ask for—say, I don't have proper documentations, but perhaps seek asylum at that point. But in this case, in what was presented— The point is that's—what you're saying is that's one set of questions, but knowing what happened when she walked up from the bank leads to a different set of answers because she's already in the country. She then remains—it may not be the same thing if she had walked across the bridge. It leads to different results, or arguably different questions at least, in this particular case. Correct, and I think it's important to point out to Your Honors that during testimony, you have testimony from the defendant's wife and from Special Agent Swivel as to what happens procedure-wise from a humanitarian standpoint and why this was done the way it was done. The smugglers try to get women and children in, and that's why defendant's wife was doing this because if we go ahead and we get them in the country from a humanitarian standpoint and we tell you, wait to get caught, wait to get apprehended, knowing that from a humanitarian standpoint, whether that is written or unwritten, they will not turn you away. They will not turn women and children away. And there was also evidence presented that she was detained at a certain point in time. They took her to a facility for mothers and children, and then she was released of her own personal recognizance because there are things called alternatives to detention, and that's something that Special Agent Swivel brought up as to that's what this whole scheme was, that they knew that this was this procedure. And the commonalities in all three victims, they were all Honduran women. They all were Honduran women with children, and it was that we are going to go ahead and get them to come into the country and tell them to walk to submit themselves, get caught, get apprehended, which goes to the argument that there was sufficient evidence presented at trial that a reasonable juror could infer that a designated port of entry is not a place where you get caught or apprehended. So is Congress, the Ninth Circuit looking at this statute or this provision after it was amended? I think it's in the Wynn case, but I might be pronouncing that wrong. They kind of said, look, the only sensible way to do this, and now I get it based on the conversation we've had today, like unless you're going to get into these really weird metaphysical distinctions about the bridge versus the border versus the actual gate where you show your papers, let's just say that what this provision is about is you have the mens rea that you are trying to evade, the INS. And if it's something less than that, like that's fine. You come in under this misdemeanor provision, which does cover bringing people to a port of entry or hoping that people get caught, that's a misdemeanor. And the felony is reserved for you are trying to avoid the INS. You are trying to circumvent getting caught and sneak into the country undetected. What's wrong with that? That seems like a pretty elegant right-line rule. I see that I'm out of time. May I answer the question? And specifically, can you ask the question one more time? I'm sorry. Why shouldn't we read this provision as it was amended post-denia to mean the felony bringing in offense is limited to cases where the defendant has the mens rea of trying to avoid detection by the INS? That is why you are dropping the person off where you're dropping them off. Why we don't read it? What's wrong with that? Well, again, I'm not in a position to speak for the entire Justice Department, but I can speak to this case specifically. That's exactly what we had in this case. An intent to avoid INS officials? It seems like on your own account the point was get yourself caught. That seems different. I think it was to avoid the actual port of entry. I'm sorry. I'm saying something different. In the Ninth Circuit, this offense requires a mens rea of trying to avoid immigration officials. Well, and I think there's different ways of perhaps getting into the country legally and illegally. In this case, it was, again, going back to why they were saying we have to have women and children come in together because from a humanitarian standpoint, we know what happens. In the Ninth Circuit, that's a misdemeanor offense. That comes in under the misdemeanor provision, but not the felony provision. The felony provision is reserved for cases where people are doing something arguably even worse, trying to avoid immigration officials altogether sneak into the country undetected and no permission to remain. Again, I would not be in a position to answer the question of why it should be one or the other, but again, what I would— That's a published opinion of the Ninth Circuit on this very provision and what it means. But I understand that you can't speak for the Department of Justice about—I understand that. Can I ask you to go back to where you started with the question? Your argument was that there was here a mens rea that they were trying to avoid the— for lack of a better word because I don't want to use port of entry—the front door, right? They were trying to avoid presenting themselves for inspection at the end of the bridge. They instead wanted to present themselves at the back door, right? And the result of that, as you suggested, there was at least evidence below that that would lead to a better outcome for her. She would be released into the country as opposed to turned back, right? Or at least that was the belief from the smugglers. It sounds like we're not sure if that's true or not, but that was at least the belief. And so the question is why would we think that there's a mens rea to avoid INS altogether? It seems hard to figure out where that comes out of the statute as opposed to a mens rea to avoid entering through the port of entry instead of its back door. Well, in the way that the statute is read, I'm not sure there's a mens rea of avoiding actually INS, but I think in this case—and I'll point the court to the joint appendix where the defendant's wife testified that as to the process to bring all the women and their children into the United States was to cross them from Mexico into the United States and let them be caught by immigration because they would retain them with the girls and then would let them go into the United States. And so you read that testimony as not including, like, present yourself at the front door. Do not present yourself at the front door. Get caught somewhere other than the front door. Exactly. I didn't read that into that testimony. And as a safeguard for these women and children to stay in the United States after they have already come and not presented themselves at a designated port of entry, then it's wait until you get caught so that you can then give them what you have, and then they will then not send you back because from a humanitarian standpoint— So when Karen, or KNO, enters the country, she says she crosses into the U.S. by boat, and when she gets to U.S. soil, she's told to start walking, and she walks to the bridge with the patrol car, and that's where she turns herself in. If that's the bridge that is the port of entry, how is that avoiding the front door? Well, I don't think it was ever presented that that was just a bridge or the bridge. But the government does have the burden of proof, and so she says it was a bridge. How—like how do—I mean, I assumed it was the bridge because there was a line of people on the bridge, she says, so I assume that's the bridge. So if that's what happened, how is that evading the front door? Because she's already in the United States. I know, but she's not—but you said she had a mens rea to avoid turning herself in. The smugglers had a mens rea that they should not turn themselves in at the front door, using the colloquial term. But it sounds to me from her testimony that the most logical reading of her testimony is that that is exactly what she did. She got on U.S. soil first. I understand that point, but the intent was not to evade the front door, at least her intent. She was told to start walking, and she walked right to the front door. Well, and I apologize if I actually spoke to the mens rea of the smugglers. I can only speak to what was presented as evidence during this trial. And during trial, defendant's wife testified that this was the plan, and she—they were doing it this way on purpose. And then we also have Special Agent Swivel that also testified that it was a common thread that they would cross the border with children. And then frequently, when people come into the United States as a family unit, if they come with their children, they're less likely to be detained. You're very consistent with presenting yourself at the front door with your children. You're presenting yourself after you've gotten into the house, so to speak. Okay. So you have set foot on U.S. soil, but what he is saying, and what I thought most of the testimony at this trial was very consistent with, was, yes, you set foot on U.S. trial at someplace other than the front door, but then you turn yourself in at the front door. You might wait to get caught by immigration officials, or you might just walk onto the bridge, get in line, and turn yourself in. Walk through the den to the front door. Yeah. Right? I mean, I just—I'm trying to figure out whether you think that it was proven at trial, beyond a reasonable doubt, that you were not supposed to do that. Don't go to the point of entry after you reach U.S. soil. Instead, wait to get picked up by a random Border Patrol agent because then things will go better for you. Do you believe that that was proven beyond a reasonable doubt at trial? I'm not sure if that has to be proven at trial. I know, but do you think it was? Because it seemed like some of your answers to questions suggested that it was proven at trial, that the point was not to get to U.S. soil and then go to the port of entry, front door, whatever we're calling it, but instead avoid at all costs that line because you will do better if you are picked up by a random border official. I would say that what was presented at trial was that it is—would better come into the country as a woman with a child, and then once you are already in the country, if you then walk upon, wait to be caught, wait to be apprehended, then you can actually get some type of documents that may allow you to stay here. But then at that point, again, you're already in the house. And to talk about you're already in the house, and then you can come back to the front door, but you've already entered the house. Okay. So if there are no more questions, I would ask the Court to affirm. You've got some time for rebuttal, sir. I'd like to briefly respond. First, as to the preservation issue, when I got this case, I basically looked at it as a case where there was sufficient evidence to prove that my client, David Whitehead, who was only charged with the Karen Adonis thing, there was sufficient evidence on his part. And as far as the designated port of entry point, it's so—as we got into that, it's more confusing, but there was insufficient evidence that he had any knowledge of where she came in, how she came in. He got into the case to go to Boston. One, two months later, got up there. He was either there one day, according to Ms. Adonis, or two or three days, according to his wife, and drove her right back to North Carolina. She and the child had made arrangements to leave her at the Sheriff's Department, and Mr. Peterson came over and picked them up. So from that standpoint, the thrust of the argument initially was that there was insufficient evidence on his part, that he had sufficient knowledge to convict him, and the case would have been dismissed. When we received the notice, that's when I looked more carefully at it, the statute itself, and there was no definition in the statute. It was certainly vague and ambiguous, and I think we've noticed that from the argument here today. I would be glad to submit under Rule 28, if you would like, a definition from Black's Law Dictionary. There's a Homeland Security case that recently came out from the U.S. Supreme Court v. Thurasin, 140-S Court, 1959. And then we pulled up HCFR 100.4, which has ports of entry. Basically for non-aircraft, and the agent testified that she came in from the Reynosa area in Mexico at the port of entry of Hidalgo, Texas, and that's what I assume. When she came in and met Border Patrol at the bridge, that's where she came in. So again, I believe there's insufficient evidence that she did not come in at a port of entry, looking that way. And secondly, certainly that my client had no knowledge of exactly where she came in or how it worked. The purpose of, and I would also argue that this was preserved. The trial attorney did make a Rule 29 motion. He argued the labor, which was dismissed. He did not get to arguing the smuggling or the conspiracy, because Judge Boyle sort of interrupted him, and he basically said, this isn't smuggling. This is just, they come in and surrender. Sort of a surrender case, and there was some colloquy about that. Judge Boyle eventually allowed the case to go to the jury, but I think certainly this issue was preserved. The whole point of preservation is to give the district court judge an opportunity to rule on the issues. So I agree with that, and what concerns me about the Rule 29 colloquy is, if I'm remembering right, there's all the discussion of labor, and then Judge Boyle sort of preserves the issue by saying, how is this smuggling? And then the U.S. attorney says it's smuggling because they didn't arrive at a designated port of entry, and that's all we need to show. And the defense lawyer doesn't say anything. Nobody presents to Judge Boyle, like, well, hang on a minute, what does that mean? And then Judge Boyle is persuaded, and he denies the Rule 29 motion on that, on those counts. And so I'm a little bit concerned that this issue really was not squarely raised before the district court. Well, I felt like probably the attorney at trial felt Judge Boyle had sort of a handle on that issue. He had mentioned earlier in examination he intervened talking to the agent about where they came in, and then it was a porous case, a porous border. There's really no line. I mean, he and Judge Boyle had intervened there, and he's generally very astute. He's a judge who he did have an opportunity to address the issues because this was an issue, and he brought some of it himself. So I think that possibly excuse the attorney for not going into that in more detail, but I would refer you all to the recent case of, I think it's Duroso, which addresses this in more. . . Anyway, I think this addresses that issue. Also, if in fact it's not, if the term may not have been preserved correctly, there is a provision that can be heard by this court to avoid a manifest miscarriage of justice. And in this particular case, we would submit that the evidence against Mr. Whitehead was quite thin at best, and certainly it's an important serious case to him if you look at the pre-sentence report. He's 45 years old, zero criminal history points, Category 1, served 20 months in jail. He's out, but he's a felon. He was never a felon before, so this is important and serious to him. And so if in fact I would not say, I say it's preserved, but if it was not, that would certainly be a fair interpretation. Thank you very much. Unless there are more questions, thank you very much. Thanks for your time. We will come down in Greek Council, and then we can adjourn court for the day. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Pamela A. Harris, Julius N. Richardson, Toby J. Heytens